**FRANK CHEVROLET COMPANY,**
Plaintiff,

v.

**GENERAL MOTORS CORPORATION,**
Defendant.

**Civ. A. No. C 66–298.**

United States District Court
N. D. Ohio, E. D.
Nov. 27, 1968.

Martin A. Rini, Donald L. Goldman, Emanuel H. Hecht, of Rini & Hecht, Cleveland, Ohio, for plaintiff.

Victor DeMarco, Cleveland, Ohio, Edmond Dilworth, Jr., Detroit, Mich., George H. Rudolph, of Jones, Day, Cockley & Reavis, Cleveland, Ohio, for defendant.

## MEMORANDUM

WILLIAM K. THOMAS, District Judge.

Plaintiff Frank Chevrolet Company, a Chevrolet dealer in Chardon, Ohio, from 1958 to 1965, brings suit against defendant General Motors Corporation for damages pursuant to the so-called Automobile Dealers' Day in Court Act, 15 U.S.C. § 1222 (1964). Defendant General Motors moves for summary judgment.

Unless otherwise indicated, the facts stated in this memorandum are undisputed. The record consists of the deposition of Frank Finesilver, plaintiff's president, interrogatory answers, affidavits submitted by the parties, and the pleadings in the case.

The Chardon, Ohio Chevrolet "point," as an automobile dealership is identified by automobile manufacturers and retail dealers, was purchased by Frank Chevrolet Company in 1958 from McCahan, the previous dealer. Chardon, the county seat of Geauga County, lies generally east of Cleveland and south of Painesville. At its center U. S. Route 6, running east and west, crosses Route 44, a north-south state highway.

The first selling agreement, dated August 21, 1958, was between Chevrolet and Frank Chevrolet Company, a co-partnership whose partners were represented to be Frank Finesilver and his brother-in-law, Dr. Allan Chester. The expiration date of the selling agreement was August 20, 1963. This was replaced with a second selling agreement, effective November 1, 1960, also between Chevrolet and the partnership. It extended the term of the franchise to October 31, 1965.

Effective July 12, 1963, Chevrolet and Frank Finesilver, as individual owner of Frank Chevrolet Company, executed a new agreement. Its expiration date also was October 31, 1965. This latter agreement was superseded by a new agreement, effective March 31, 1965, between Chevrolet and Frank Chevrolet Company, a corporation.

By letter of June 11, 1965, Chevrolet notified Frank Chevrolet Company that

> because of the sustained and apparently hopelessly deficient sales performance of Frank Chevrolet Company * * * Chevrolet Motor Division will not offer your company a new Selling Agreement following the expiration of your current Selling Agreement on October 31, 1965, due to your failure to comply with Section 9 thereof.

It is Chevrolet's non-renewal of the last selling agreement which gives rise to plaintiff's action.

Each signed agreement provided that the dealer had the obligation

> to develop properly the sale thereof at retail particularly in the following area: In the state of Ohio: Geauga County, Chardon, Chesterland, East Claridon, Huntsburg, Montville, Newbury, Novelty, Thompson, including non post office areas served by post office stations located in the above named communities.

Each of the signed agreements between Chevrolet and Frank Chevrolet Company incorporated and made applicable a document entitled "Terms and Conditions—Dealer" which consists of standard provisions affecting all dealers. Each signed agreement also stated that it was a personal service contract entered into by Chevrolet with Frank D. Finesilver.

> In its complaint plaintiff alleges that: Defendant failed to act in good faith in performing and complying with the terms and provisions of the franchise and in terminating and not renewing the franchise with plaintiff.

Under 15 U.S.C. § 1222 (1964), an automobile dealer may bring a suit against an automobile manufacturer "by reason of the failure of said automobile manufacturer * * * to act in good faith * * * in terminating, canceling,

or not renewing the franchise with said dealer * * *." By Section 1221(e) "good faith" is defined to mean:

> The duty of each party to any franchise * * * to act in a fair and equitable manner toward each other so as to guarantee the one party freedom from coercion, intimidation, or threats of coercion or intimidation from the other party * * *.

█ Under Section 1222 the absence of good faith as defined in Section 1221 (e) is literally construed. Thus, Southern Rambler Sales, Inc. v. American Motors Corp., 375 F.2d 932, 935 (5th Cir. 1967) typically rules that

> good faith or the lack of it must be determined in the context of "coercion, intimidation, or threats or coercion or intimidation from the other party."

In considering defendant's motion for summary judgment it therefore must be determined whether the record presents a genuine issue of material fact on plaintiff's claim that defendant failed to act in good faith. To preserve this issue for a trial on the merits the present record must contain evidence sufficient to permit a finding of "coercion, intimidation, or threats of coercion or intimidation" on the part of defendant General Motors "in terminating and not renewing the franchise with plaintiff."

Defendant urges that all of the facts relied upon by plaintiff to demonstrate defendant's lack of good faith, even if accepted, do not establish a claim under the Act. It is asserted that:

> Finesilver, in his deposition, has made two, and only two, claims of lack of good faith on the part of defendant General Motors.

Before examining these two claims, as presented in the testimony of Frank Finesilver, other claims of lack of good faith made in plaintiff's brief will be studied. In considering the defendant's motion for summary judgment, a construction most favorable to the plaintiff must be given the evidence in the record. Plaintiff first contends that:

> Defendant's refusal to renew plaintiff's franchise on the basis of Section 9 of the Dealer Selling Agreement was a violation *per se* of the Day in Court Act.

In advancing this claim plaintiff relies on Madsen v. Chrysler Corp., 261 F.Supp. 488 (N.D.Ill.1966). Incorporating a quotation from Judge Will's opinion plaintiff urges that

> Section 9 is "an arbitrary, coercive and unfair provision" and defendant's nonrenewal of plaintiff's franchise pursuant thereto was a violation of the Day in Court Act.

In *Madsen* Judge Will enjoined Chrysler Corporation from canceling Chrysler, Plymouth, and Imperial franchises. Chrysler terminated the franchises because of the failure of the dealer to fulfill his "minimum sales responsibility" or "MSR." On appeal the judgment was vacated, 375 F.2d 773 (7th Cir. 1967), prompting one court to declare that *Madsen*, therefore, "is not valid authority." Thayer Plymouth Center, Inc. v. Chrysler Motors Corp., 255 Cal.App. 2d 300, 63 Cal.Rptr. 148 (Ct.App.1967). Chrysler franchise agreements use a formula for computing "minimum sales responsibility" of a dealer, similar to the formula in Section 9 of the Chevrolet selling agreement, to evaluate a dealer's "satisfactory sales performance." Like similar provisions in dealer agreements of other automobile manufacturers, Chryler and Chevrolet compare a dealer's sales with total sales of competitive makes in his area of sales responsibility to the percentage which sales of the franchised car bear to total sales of competitive makes in the larger metropolitan sales territory.

Judge Will's opinion indicates that he believes that "without adjustment for the various factors herein discussed" use of the formula for determining "minimum sales responsibility" is a coercive standard of dealer performance because it would enable the manufacturer "to

terminate roughly one-third to one-half of its dealerships at any time." Among these "various factors" he had previously noted in 261 F.Supp. at page 505 that:

> Chrysler's conduct between March 1964, and even after notice of termination was served, is hardly consistent with the contention it now advances, i. e., that Madsen had clearly defaulted on its contractual obligations and that therefore Chrysler had the unqualified right to terminate the dealership agreement at any time.

He also observed that the manufacturer treated "minimum sales responsibility" "more as a goal than a performance standard * * *." *Id.* at 508.

Judge Will's opinion forcefully focuses attention on the potential capacity for coercion in the franchise provision which "would enable" an automobile manufacturer "to terminate roughly one-third to one-half of its dealerships at any time." Nevertheless, *Madsen, supra,* is not construed as a general holding (without reference to the "hard" facts of that case), that termination of a dealer's franchise based on a dealer's failure to achieve the prescribed market potential, as a matter of law, constitutes a violation of the Day in Court Act. Instead, *Madsen* holds that it was coercive "in this instance" to employ the minimum sales responsibility formula as the ground for terminating this dealer's franchise. *Id.* at 507.

Moreover, *Madsen* deals with a forced termination of a dealer's franchise rather, as here, with a non-renewal of a franchise. Apparently regarding this distinction as significant, Judge Will's opinion states, at p. 505:

> The fact that Chrysler thought that another type of operation would produce better results obviously does not create the right to terminate an existing dealership on a forced basis. While it might give Chrysler a good faith reason to fail to renew an agreement, Chrysler has chosen to give its

dealers continuing agreements terminable only for the causes stated.

Termination of a dealership franchise for failure to meet a sales criterion such as Chrysler's MSR, has been held not to constitute prima facie evidence of a violation of the Day in Court Act. See Milos v. Ford Motor Co., 317 F.2d 712, 716–17, 7 A.L.R.2d 1162 (3rd Cir. 1963); Victory Motors of Savannah, Inc. v. Chrysler Motors Corp., 357 F.2d 429 (5th Cir. 1966).

■ Accordingly, it is found and determined that defendant's non-renewal of the "current Selling Agreement * * due to [Frank Chevrolet's] failure to comply with Section 9 thereof," does not amount to either a per se violation or evidence of a violation of the Day in Court Act.

Plaintiff's brief next contends that "Section 9 of the Dealer Selling Agreement is coercive and unfair as applied to Plaintiff." Section 9 specifies that a dealer "shall provide satisfactory sales performance" in the dealer's area. The section first states that:

> evaluation of Dealer's sales performance shall be based on the relationship of Dealer's sales of new Chevrolet motor vehicles in such area to the sales of other makes of motor vehicles directly competitive * * * as compared to a similar relationship of the sales of new Chevrolet motor vehicles to other makes of motor vehicles directly competitive therewith specifically in the Chevrolet Zone area wherein Dealer is located. * * *

Defendant's letter giving notification of non-renewal, sent to the plaintiff on June 11, 1965, stated:

> The passenger car sales performance of Frank Chevrolet Company under its current Selling Agreement as indicated by the following statistics, has consistently fallen well below acceptable standards.

Reproduced verbatim in a footnote below [1] these statistics reveal that over the last four years of the dealership the trend of sales efficiency went up 10 percent, never reaching 50 percent, and then declined. Figures for earlier years, supplied in the interrogatory answers, reveal that the 51 percent efficiency achieved in 1959 was the only year in the history of the dealership that sales efficiency exceeded 50 percent.

■ In the absence of evidence questioning its sincerity, Chevrolet's conclusion expressed in the following sentence in the non-renewal notification letter is justified by Frank Chevrolet's sales efficiency of less than 50 percent, continuing as it had for more than four years. The sentence reads:

> In our considered judgment, this persistently inadequate sales performance, as measured by the tests set forth in the Selling Agreement, leaves no doubt of a clear necessity on our part to seek other representation in your area of sales responsibility.

This conclusion takes into account "the trend of Dealer's sales performance over a reasonable period of time," one of several "pertinent factors" which should also be taken into account under Section 9 of the Dealer Selling Agreement. Section 9 thus further provides:

such evaluation * * * shall also take into account other pertinent factors, such as the trend of Dealer's sales performance over a reasonable period of time, the availability and the delivery of Chevrolet motor vehicles to Dealer, and local conditions directly affecting such sales performance.

In this connection plaintiff insists that the defendant failed to take into account "local conditions directly affecting such sales performance." As a predicate for this argument, plaintiff relies on language which it underscores in the opinion of Leach v. Ford Motor Co., 189 F.Supp. 349, 352 (N.D.Cal.1960). In the course of an opinion denying recovery to a dealer suing under the Day in Court Act the trial judge stated:

> Assignment of a market potential in the course of honest business judgment by a manufacturer to a dealer as a measure of unexpected performance within an area is not inherently unfair or arbitrary. A market potential is not a requirement that a dealer sell a given number of cars in any event. Rather, it is a percentage factor of one dealer's share of sales by many dealers in an area. * * * *Only if the percentage factor for any one dealer is out of line could he be prejudiced by*

| 1. Your Company's % of Efficiency to Zone Average Based on Your Company's Reported Sales | | Per Cent of Efficiency of Your Area of Responsibility to Zone Average Based on Chevrolet Registrations | Your Company's Reported Sales | Indicated Sales by Others in Your Area Based on Registrations |
|---|---|---|---|---|
| Pass. Cars | | | | |
| 1961 | 35.2 | 93.3 | 127 | 211 |
| 1962 | 38.5 | 94.3 | 197 | 287 |
| 1963 | 46.5 | 90.5 | 256 | 239 |
| 1964 | 45.6 | 90.9 | 227 | 222 |
| Mar. 1965 | 40.9 | 87.5 | 51 | 58 |
| Trucks | | | | |
| 1961 | 32.3 | 74.0 | 11 | 21 |
| 1962 | 34.0 | 68.0 | 15 | 15 |
| 1963 | 20.4 | 62.7 | 17 | 35 |
| 1964 | 30.1 | 87.8 | 24 | 46 |
| Mar. 1965 | 18.7 | 74.0 | 4 | 12 |

*the so-called market potential formula.* [Court's emphasis.]

Plaintiff contends that "the affidavit of plaintiff's president, Frank D. Finesilver, states facts showing the existence of a bona fide dispute as to a material issue whether the 'percentage factor' for plaintiff was 'out of line.' "

The affidavit lists three factors which "prevented plaintiff" from operating "at 100% efficiency." One "was the proximity of other Chevrolet dealers to portions of plaintiff's area of responsibility." The evidence shows that this condition existed when plaintiff assumed the dealership. The second was:

a strong tendency for Chesterland residents to drive west on U. S. Route 322 to the eastern suburbs of Cleveland for shopping, rather than east on Route 322 and then north on Ohio Route 44 to Chardon.

Plaintiff testified that sometime before November 1960, when Chesterland was reinstated in his renewed franchise, Chevrolet made a survey which shows that "people in the Chesterland area will normally go west to purchase their automobiles instead of coming east." Thus plaintiff's deposition testimony shows that both the plaintiff and Chevrolet knew of this local condition at least as early as November 1960.

The third factor listed in Finesilver's affidavit said to affect plaintiff's efficiency is

the tendency of automobile purchasers to buy their autos from dealers located near the purchasers' places of employment, so that they may drop their vehicles off for servicing on their way to work and pick them up at the end of their workday. Many of the residents of plaintiff's area of responsibility work in Cuyahoga and Lake Counties, and purchase their automobiles there.

▮ The record does not show that these purported facts are within plaintiff's personal knowledge, or that he is competent to make such a statement. Thus Rule 56(e), Federal Rules of Civil Procedure, is not satisfied. However, in considering this part of plaintiff's argument it will be assumed for present purposes that further discovery would offer proof of the existence of this third "major factor," and that such facts were known to the defendant.

In urging that defendant failed to take into account these three local conditions in determining plaintiff's percentage of market potential, plaintiff points to these paragraphs of the non-renewal negotiation letter:

A significant factor is apparent from your per cent of average efficiency based upon registrations, which has substantially exceeded your per cent of average efficiency based upon sales, indicating a considerable number of transactions by neighboring dealers who apparently are able to easily develop sales in your area of responsibility notwithstanding your natural location advantage.

At the same time, we know of no circumstance, such as lack of availability of new units, or local conditions which satisfactorily explain or justify the substandard sales performance of Frank Chevrolet Company.

Plaintiff then argues:

The inference is clear that defendant knew of and ignored the "local conditions which satisfactorily explain or justify the substandard sales performance of Frank Chevrolet Company." Plaintiff is entitled to the benefit of this and other inferences showing that defendant failed to act in good faith, in violating the provisions of a franchise dictated by defendant.

Plaintiff does not contend that the existence of these local conditions represents direct evidence to support its claim that defendant acted coercively in refusing to renew Frank Chevrolet's selling agreement. Instead, it relies on circumstantial proof. It first infers that defendant "knew of and ignored the local condition which satisfactorily explain or justify the substandard sales performance of Frank Chevrolet Company."

The evidence in the record reveals that both the plaintiff and the defendant knew of the first and second listed local conditions. Should it be assumed that further discovery would establish the third local condition involving the buying habits of Geauga County residents who buy cars where they work in Cuyahoga and Lake Counties, the record would not thereby show that the defendant but not the plaintiff had knowledge of this condition. Yet if the plaintiff knew of all three local conditions he may not presently raise this matter if he did not seasonably urge that some or all of these local conditions required a downward adjustment of his sales efficiency potential. The record fails to disclose that previous to his present affidavit that plaintiff ever complained that because of these three local conditions his sales efficiency "percentage factor" was out of line.

Moreover, there is no evidence in the record to justify the claimed inference that the defendant ignored the local conditions in fixing the plaintiff's percentage of market potential. One cannot reasonably draw this inference from the statement in the non-renewal notification letter that "we know of no circumstances, such as * * * local conditions which satisfactorily explain or justify the substandard sales performance of Frank Chevrolet Company." This statement more reasonably permits the inference that all local conditions were considered, yet none were known which would explain the inefficiency of plaintiff's sales.

Hence it cannot be inferred from the evidence in the record that these local conditions required a downward adjustment of plaintiff's percentage of market penetration, or that in fixing plaintiff's percentage defendant ignored these local conditions. Moreover, the record does not reasonably permit, and the law will not allow, a second layer inference that the defendant thereby "failed to act in good faith, in violating the provisions of a franchise dictated by defendant." On this branch of the motion it is found

and determined that there is no direct or indirect evidence in the record that Chevrolet's express reliance on Section 9 as a basis for non-renewal of the Frank Chevrolet selling agreement constituted lack of good faith under the Day in Court Act.

As mentioned at an earlier point, Finesilver was asked in his deposition to describe all acts of lack of good faith which he attributed to the defendant. He did not mention Section 9. However, he did make two claims of lack of good faith.

The first claimed lack of good faith involves a statement attributed by Frank Finesilver to George Scharf, the assistant zone manager of Chevrolet. Finesilver states that in January 1965, he was in Scharf's office with an attorney, Mr. Soren. Finesilver told Scharf he wanted to incorporate the business with Mr. Soren as a stockholder. He quotes Mr. Scharf as saying at that time that "they did not want to deal with any other principals other than Frank Finesilver and that I could remain as a dealer as long as I wished providing all stock was in my name."

Assuming it were found that Scharf made the statement, there is no proof in the record that Scharf (or any other employee of Chevrolet) would have authority to saddle Chevrolet with a permanent franchise. Apart from this uncleared hurdle, the statement attributed to Scharf is an oral representation which may not underlie a claim of bad faith or coercion under the Act. See Alfieri v. Willys Motors, Inc., 227 F.Supp. 627, 629 (E.D.Pa.1964); Southern Rambler Sales, Inc., *supra*, 375 F.2d at 934.

Finesilver secondly stated in substance that defendant failed to use good faith in that it did not assist him in selling the assets associated with his franchise. Finesilver recites various efforts to sell his business. For one reason or another each negotiation fell through. In some of these instances Chevrolet refused to approve granting of the franchise to the prospective purchaser. However, since the franchise was not the plaintiff's prop-

erty to sell but Chevrolet's power to extend, Chevrolet's action cannot be deemed coercive.

Plaintiff focuses this claim on Chevrolet's alleged interference with Finesilver's negotiations with McClintock, the Chevrolet dealer in Kirtland whom Chevrolet franchised as a combined Chardon-Kirtland dealer. Bearing on this matter Finesilver testified that "Chevrolet Motor had told me that Mr. McClintock would be the only one that would be approved." However, Finesilver was asked, "They did not dictate to you the price, did they * * *?" He answered, "No." He testified that McClintock made an offer of $25,000 but that he wanted $40,000 to $50,000. The parties did not get together and Frank Chevrolet's business assets were not sold to McClintock. Apparently the assets have not been sold to any other auto dealer.

 Plaintiff correctly argues that "the statutory language, 'terminating, canceling, or not renewing the franchise' can and should be interpreted as referring to an act continuing in nature, and not one limited to an instant in time." Thus the negotiations between Finesilver and McClintock, occurring after the transmission of the non-renewal notice before the final termination date of the franchise on October 31, 1965, timewise are within the reach of the Act.

 Undoubtedly, the price of $25,000 purportedly offered Finesilver by McClintock was affected by Chevrolet's designation of McClintock to be the new holder of the Chardon point franchise. Assuming the non-renewal of Frank Chevrolet's franchise is non-coercive, as previously found, Chevrolet had the right to appoint a new Chardon dealer. Accordingly, the act of dealer designation in and of itself cannot be treated as a coercive act, even though Chevrolet's appointment of McClintock made it difficult for Frank Chevrolet to sell its assets to another person or to secure its desired price from McClintock.

Even a deliberate act by an automobile manufacturer to prevent a new dealer from undertaking too heavy a financial commitment to a terminated dealer has been held to be non-coercive. See Pierce Ford Sales, Inc. v. Ford Motor Co., 299 F.2d 425, 429–30 (2d Cir. 1962). As seen above Finesilver admits Chevrolet did not peg the top price of his assets in any sale to McClintock.

It is, therefore, found and determined that neither of the claims recited by Finesilver in his deposition constitutes lack of good faith within the meaning of the Act.

As a defense also requiring summary judgment, defendant cites "breaches of the franchise agreement, in addition to Frank Chevrolet's uniform failure to meet reasonable performance standards." Developed "from Finesilver's testimony * * * and the documents before the court" the defendant contends that the "uncontroverted facts" show that "Finesilver was always undercapitalized and was unable to operate the dealership in satisfactory fashion" and that this was "concealed * * * from General Motors over the years by admittedly false financial statements."

An examination of the record reveals these undisputed facts which are pertinent to this claimed defense. From its inception as a Chevrolet dealership in August 1958, until its incorporation in early 1965, the Frank Chevrolet Company operated as a partnership whose partners were Frank D. Finesilver and Robert Radnor, his brother-in-law. Chevrolet rejected and never approved Radnor's financial interest in the dealership. To obtain the dealership Dr. Allan Chester, another brother-in-law of Finesilver, joined Finesilver in applying to Chevrolet for the franchise. The application stated that Dr. Allan Chester was prepared to invest $10,500. Dr. Chester's financial interest in the dealership was reaffirmed in annual dealer's statements for the years 1958, 1959, and 1960. In fact Dr. Chester contributed nothing. His alleged contribution was paid by Radnor.

The selling agreement of July 12, 1963, listed Frank D. Finesilver as the purported individual owner of Frank Chevrolet Company. Contrary to Finesilver's certification of the statement, Robert Radnor remained as Finesilver's partner until the partnership was dissolved by an agreement of Finesilver and Radnor bearing the date of April 23, 1963.

The dealer statement of Frank Chevrolet Company, a corporation, executed March 29, 1965, listed Frank D. Finesilver and Molly D. Finesilver as the only persons having "either owner or management interest." Another column required a listing of all persons who either "(a) Directly or Indirectly Supplied Funds to Dealer * * * or (b) Has Direct or Indirect Profit Sharing Arrangements Other than as Related to Ownership." No name is listed. Contradicting this statement, sometime between March and May 1965, Frank Chevrolet Company, the corporation, according to its minutes, granted a 20-year employment contract to Chadwick Rakusin, and a 28 percent interest, and the Ash brothers a 3.5 percent interest, in the net profits of the company. These grants were in consideration of loans to the company not reported to Chevrolet.

The maintenance of minimum amounts of net working capital (known as capital standards) was a basic requirement of the dealership. In the original application Finesilver stated he was prepared to invest $29,500 and Dr. Chester was prepared to invest $10,500. The first "Dealer Statement of Ownership, Financial Interest and Active Management," dated August 21, 1958, listed Frank D. Finesilver, partner, $29,500 and Allan Chester (Bro-in-Law) $10,500, and net working capital of $33,000.

Finesilver never met his promised capital requirements. Yet he made it to appear that he did. In part he did this by borrowing $17,500 from Sun Finance Co. with whom Finesilver further agreed to floor plan new cars. Bank accounts were then opened totaling $17,500. Bank letters evidencing these bank accounts were presented to Chevrolet.

Thereafter, unknown to Chevrolet, the accounts were closed in whole or in part. As part of the transaction Sun Finance's loan was reduced by $9,000.

Finesilver submitted untrue financial statements to Chevrolet from June or July 1960, to the end of that year. He stated that he submitted inaccurate and incorrect financial statements "to maintain net working capital structure" or "minimum standard requirements." The same false records were submitted to Sun Finance, he stated, to assist him in "floor planning" his cars. The figures that were falsified involved the "parts inventory," "work in process" and "accessories." Asked if "it was easier to give false information concerning these specific items than, for example, the number of cars that were floor planned, both used and new * * *," he answers, "Yes."

The 1964- year-end statement reported dealership assets of $115,982.01 and liabilities and reserves of $76,461.11. This resulted in a reported net worth of $39,520.90. Similarly, the dealer statement of March 29, 1965, declared net worth to be $37,200, taken allegedly from a financial statement of January 31, 1965. In contrast, the partnership dissolution agreement of April 23, 1965, giving figures for the end of 1964, reported assets of $89,743.07, liabilities of $85,715.18 and a "net worth to the two (2) partners of Four Thousand Twenty-Seven Dollars and Eighty-Nine Cents ($4,027.89) * * *."

Periodic dealership reports to Chevrolet of "funds to dealer" supplied "directly or indirectly" omit personal loans to Finesilver used to pump needed capital into the busines. These loans are recounted in the partners' dissolution agreement. At one point it states:

the aforesaid Frank Finesilver and Robert C. Radnor are further indebted personally and as partners for obligations of the partnership not shown upon the books and records of the partnership in the approximate amount as follows: [Itemized are 11 different obligations totaling $37,550.]

On May 1, 1965, after its incorporation, Frank Chevrolet Company gave a note for $20,000 to Chadwick Rakusin, as attorney for Rhoda S. Upson. This obligation increased an earlier $14,000 loan from Rakusin. Yet the dealer statements submitted by Frank Chevrolet to Chevrolet failed to record the Rakusin indebtedness.

On several occasions Frank Chevrolet double financed the purchase of a new car. That is, Finesilver obtained a loan on a new car although it was already encumbered. At one point floor planning (new car financing) was shifted from Sun Finance to CIT. When he went out of trust (double financing) with CIT the account was terminated. Finesilver stated he went out of trust because he was in desperate need of funds. For a period he was unable to get new car financing. As a result he had no new cars to sell. He later obtained GMAC financing. In 1965 he went out of trust with GMAC. On several cars floor planned by GMAC he also obtained loans from Chardon Savings & Loan.

As further evidence of the company's financial floundering the record reveals that various creditors were forced to sue Finesilver to collect on dealership debts.

Defendant claims that "if the case should be tried upon the merits, General Motors would be entitled to rely on these many breaches of the franchise as a defense." It is therefore urged that since the facts comprising these breaches are not in dispute the defendant is entitled to summary judgment on this defense.

In resisting this branch of defendant's motion, plaintiff in effect contends that its cause of action, arising under 15 U.S.C. § 1222 (1964), is not subject to such a defense.

Title 15 U.S.C. § 1222 recognizes that a manufacturer may assert a defense based on "the failure of the dealer to act in good faith." Section 1222 stipulates lack of good faith as the basis of the dealer's right of action against a manufacturer, and also as the basis of a manufacturer's defense to a dealer's claim. Lack of good faith, as used in Section 1222 must mean the same for each side. It involves "coercion, intimidation, or threats" thereof, as defined in Section 1221(e). However, in fashioning a reciprocal lack of good faith defense to a lack of good faith right of action, Section 1222 does not declare that this is the solitary defense which a manufacturer may assert. Absent an express exclusion, the Act does not imply a repeal of any common law defense available to a manufacturer to a dealer's claim based on the Act.

Indeed Congress expressly declared that the manufacturer's good faith defense was "in addition to any other defense." H.R.Rep.No. 2850, 84th Cong., 2d sess., 1956 U.S.Code Cong. & Ad. News, p. 4602.

The cause of action created under Section 1222 is a new right of action. It is not the codification of a breach of contract right of action. As plaintiff observed at the oral hearing, and reiterates in his final brief, if it were merely the latter, the expiration of the franchise, as in this case, would be a complete defense to the Act's created right of action for a manufacturer's "failure * * * to act in good faith in * * * not renewing the franchise with said dealer * * *."

A "failure * * * to act in good faith in * * * not renewing the franchise," in a minimum number of words, says that the dealer has a right of action when a manufacturer's non-renewal of a dealer's franchise is due to the manufacturer's act of bad faith (coercion, intimidation, or threats thereof). Three elements are essential. First, the manufacturer must have committed an act of bad faith. Second, the manufacturer's act of bad faith must be the direct cause of the non-renewal of the expiring franchise agreement. In other words, but for the manufacturer's act of bad faith the expiring agreement would have been renewed. Third, the non-renewal of the franchise resulted in loss or damage to the dealer.

It follows from this analysis of the nature of the right of action which plaintiff claims that, if the dealer has materially breached the expiring franchise agreement and there has been no waiver of the breach, there is no franchise agreement to be renewed. Under such circumstances non-renewal of the franchise agreement cannot give rise to a cause of action even though concurrently, but not as a cause of the dealer's material breach, the manufacturer committed an act of bad faith. Accordingly, it is concluded and determined that any material breach of the franchise agreement which expired October 31, 1965, may be asserted as a defense to the plaintiff's cause of action.

Each Dealer's Selling Agreement between Frank Chevrolet and Chevrolet was designated as a personal service contract, and was entered into by Chevrolet with dealer "in reliance upon and in consideration of the personal qualifications of and representations * * * of Frank D. Finesilver." Thus the underlying consideration of the selling agreement was the "personal qualifications * * * and representations" of Frank D. Finesilver. The chronicled acts of misrepresentation and concealment of Frank D. Finesilver in his operation of Frank Chevrolet Company, continuing right up to the expiration of the franchise, destroyed this basic contractual consideration and materially breached the franchise agreement. This breach constituted a cause to cancel each of the selling agreements. This breach therefore provided a valid reason for non-renewal of the agreement expiring on October 31, 1965.

The dealer reports submitted by Frank Chevrolet Company and Finesilver to Chevrolet declared that the information supplied by the dealer was represented to be "true, accurate and complete." These reports expressly made such misrepresentations "cause for termination of the undersigned Dealer's current Chevrolet Dealer's Selling Agreement under subsection B(4) (c) of Section 18 thereof."

By false financial statements and reports, by concealing the true ownership interests and the true financial interests of the dealership, by concealing the true capitalization of the business of the dealership, by failing to maintain minimum capital standards set by Chevrolet, and by concealing the virtual insolvency of the dealership at the end of 1964 and during 1965, Frank Chevrolet Company violated its express representations in its dealer reports to Chevrolet and thereby breached the selling agreement. Basic to the agreement's existence and continuation these breaches are material.

Further denying the applicability of plaintiff's undisputed breaches of the expiring selling agreement, plaintiff contends that this defense cannot be asserted because it was not set forth in the non-renewal notification letter of June 11, 1965. It has been held that:

If the manufacturer simply does not renew after failure to communicate in any way with the dealer but after properly fulfilling its part of the agreement, it cannot be liable for failing to act in good faith as defined by the Act. Berry Brothers Buick, Inc. v. General Motors Corp., 257 F.Supp. 542, 546 (E.D.Pa.1966).

Hence the failure to state a ground for non-renewal cannot be deemed a waiver of that ground.

However, the circumstances of this case would not support a claim of waiver in any event. It has been disclosed that the acts of misrepresentation and concealment which have been previously described were disclosed to the defendant in 1967 through its use of compulsory discovery procedures in this action. As shown, the acts of Frank Chevrolet Company and Frank D. Finesilver, involving misrepresentation and concealment, which recurred during the life of the expiring franchise agreement, materially breached that agreement, even though the breaches were then unknown to the defendant. Following the revelation of the uncontroverted facts disclosing the breaches by Frank D. Finesilver and

Frank Chevrolet Company of the expiring dealer's selling agreement, and the predecessor agreements as well, the defendant, through its motion for summary judgment, has acted to assert these material breaches as a defense to plaintiff's action.

In a contract action, but nonetheless analogous, College Point Boat Corp. v. United States, 267 U.S. 12, 16, 45 S.Ct. 199, 201, 69 L.Ed. 490 (1925) holds that:

> [A party] may, likewise, justify an asserted termination, rescission, or repudiation, of a contract by proving that there was, at the time, an adequate cause, although it did not become known to him until later.

Finally, plaintiff seeks to counter defendant's motion for summary judgment by a request that it be permitted to pursue additional discovery. It asks that defendant be required:

> to answer Plaintiff's Interrogatories Nos. 11, 20, 21, 22, second half, at least as to those dealers in the Cleveland Zone of an efficiency of less that 100%.

The only factual statement in the record which supports the request for further discovery is the allegation in Finesilver's supplemental affidavit that:

> defendant has renewed or not cancelled the franchises of other dealers in the Cleveland Zone whose efficiency differed little from plaintiff's efficiency.

Assuming that additional discovery would corroborate this statement, these facts if obtained would not be sufficient to permit an inference of bad faith amounting to coercive conduct on the part of Chevrolet. Similar to the quoted allegation, in *Madsen, supra,* there were other dealers "whose efficiency differed little from plaintiff's efficiency," but whose franchises were not cancelled. Unlike *Madsen,* however, there is here present no additional direct or circumstantial evidence that would permit a finding that defendant had an ulterior motive for non-renewal of the dealer franchise.

In any event, plaintiff does not claim that the requested discovery can alter the facts which establish the plaintiff's breaches of the expiring selling agreement. In view of the uncontroverted character of these facts, these breaches constitute a defense as a matter of law to the plaintiff's cause of action.

■ A district judge must be mindful of the appellate admonition "that a trial judge should be slow in disposing of a case of any complexity on a motion for summary judgment." S. J. Groves & Sons Co. v. Ohio Turnpike Comm., 315 F.2d 235, 237–238 (6th Cir. 1963); Columbus Services, Inc. v. Preferred Building Maintenance, Inc., 398 F.2d 80 (6th Cir. 1968).

■ A trial judge must recognize too that even though the facts may be undisputed, when different inferences may be drawn from those facts, a "genuine issue" exists and summary judgment is not permissible. Poller v. Columbia Broadcasting System, 368 U.S. 464, 472–473, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962).

Yet as here where the entire record conclusively favors the movant on every material issue, where any possible inference favorable to the plaintiff is completely rebutted by undisputed facts in the record and, where additional discovery could not alter these facts, summary judgment is appropriate and warranted. See First National Bank of Ariz. v. Cities Service Co., 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed. 569 (1968). See also *Berry Brothers Buick, supra,* in which summary judgment in an action brought by a dealer under Section 1222 has recently been affirmed. 377 F.2d 552 (3rd Cir. 1967).

For all the foregoing reasons defendant General Motors' motion for summary judgment is granted.